SD:EDP
F.#2014R00236

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – –X          14-529 M<

UNITED STATES OF AMERICA

    - against -

SHU YONG YANG,
RONG WEI YANG,
JIA BIN JIANG,
HAN WOON NG,
FNU LNU,
       also known as "AH MING,"
SZE WONG TSUI,
and FNU LNU,
       also known as "KEVIN,"

           Defendants.

– – – – – – – – – – – – –X

<u>TO BE FILED UNDER SEAL</u>

<u>COMPLAINT AND AFFIDAVIT
IN SUPPORT OF
ARREST WARRANTS</u>

(21 U.S.C. § 846)

EASTERN DISTRICT OF NEW YORK, SS:

       JUSTIN JACOBS, being duly sworn, deposes and states that he is a Special

Agent with the Drug Enforcement Administration, duly appointed according to law and acting

as such.

       Upon information and belief, in or about and between July 2013 and June 2014,

both dates being approximate and inclusive, within the Eastern District of New York and

elsewhere, the defendants SHU YONG YANG, RONG WEI YANG, JIA BIN JIANG, HAN

WOON NG, FNU LNU, alias "AH MING," SZE WONG TSUI, and FNU LNU, alias

"KEVIN," together with others, did knowingly and intentionally conspire to distribute and

possess with intent to distribute a controlled substance containing methamphetamine, a

Schedule II controlled substance, and 3,4-methylenedioxymethcathinone hydrochloride

("methylone"), a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1).

(Title 21, United States Code, Section 846)

The source of your deponent's information and the grounds for his belief are as

follows:[1]

1.      I am a Special Agent with the Drug Enforcement Administration

("DEA").   I have been a DEA Special Agent for more than one year and am currently assigned

to Group D-34, New York Field Office, where I am tasked with investigating narcotics

trafficking and money laundering, as well as other offenses.

2.      During my tenure with the DEA, I have participated in narcotics

investigations during the course of which I have: (a) conducted physical and wire surveillance;

(b) executed search warrants at locations where drugs, drug proceeds, records of narcotics,

money laundering transactions and firearms have been found; (c) reviewed and analyzed

numerous taped conversations and records of drug traffickers; (d) debriefed cooperating drug

traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets

prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug

trafficking and money laundering.   Through my training, education, and experience, I have

become familiar with (a) the manner in which illegal drugs are imported and distributed; (b) the

method of payment for such drugs; and (c) the efforts of persons involved in such activity to

avoid detection by law enforcement.

---

[1]      Because the purpose of this Complaint is to set forth only those facts necessary to
establish probable cause to arrest, I have not described all the relevant facts and circumstances
of which I am aware.

3.      I am currently participating in an investigation of a narcotics and firearms distribution conspiracy concerning defendants SHU YONG YANG ("SHU YONG"), RONG WEI YANG ("RONG WEI"), JIA BIN JIANG ("JIANG"), HAN WOON NG ("NG"), FNU LNU, alias "AH MING" ("AH MING"), SZE WONG TSUI, alias "Jimmy" ("TSUI"), FNU LNU, alias "KEVIN" ("KEVIN") (collectively, the "Target Subjects") and their co-conspirators. I am familiar with the facts and circumstances set forth below from my participation in this investigation.   The facts set forth in this Affidavit are based, in part, on information that I have learned from the review of written documents prepared by, and conversations with, members of the DEA, FBI and other law enforcement agencies; interviews with a cooperating witness ("CW"); interviews with an undercover agent ("UC"); interception of wire communications; surveillance; and review of various documents obtained by subpoenas.   Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.    All referenced transcripts are in draft translation and form.

## PROBABLE CAUSE

4.      In and around July 2013, DEA agents received information from a reliable confidential source (the "CW") that JIANG was distributing crystal methamphetamine ("crystal meth") in Flushing, Queens.   The CW agreed to introduce JIANG to a DEA agent acting in an undercover capacity (the "UC").   On July 22, 2013, the UC met with the CW and JIANG and obtained a sample of crystal meth from JIANG.   JIANG further stated he would introduce the UC to the supplier of the sample so that they could deal directly.

5.      Over the next month, the UC met on a couple of occasions with JIANG and RONG WEI, another Target Subject of this investigation.   During these meetings, RONG WEI told the UC that the sample of crystal meth that JIANG gave the UC was of inferior quality and that RONG WEI could provide a better product from his source of supply.   RONG WEI added that he could introduce the UC to his source of supply.   RONG WEI later provided the UC with his telephone number and introduced the UC to NG, whom RONG WEI identified as his source of supply.

**September 10, 2013 Crystal Meth Transaction**

6.      In September 2013, the UC had several discussions with RONG WEI about a larger purchase of crystal meth.   On September 10, 2013, the UC met with JIANG, NG and RONG WEI and paid $2000 as a partial payment for approximately 15 grams of crystal meth.   RONG WEI handed the UC the narcotics; NG collected the money from the UC.   Later that month, the UC met with JIANG and NG and paid an additional $2000, which NG and JIANG split.   Throughout the transactions, the parties referred to the crystal meth in code, using words like "cabinet" to refer to narcotics.

7.      Throughout September and October 2013, the UC also talked with the Target Subjects about whether they could provide the UC a firearm without serial numbers. Again, code was used: the firearm was referred to as a "metal cabinet," among other terms.

**November 22, 2013 Methylone Transaction**

8.      In November 2013, the UC was introduced by JIANG and NG to AH MING, an individual who described himself as a dealer of "molly."   The UC expressed to AH MING an interest in purchasing two ounces of molly.   On November 22, 2013, JIANG, NG,

AH MING and Target Subject SHU YONG met with the UC to consummate the molly transaction.   SHU YONG and AH MING explained the transaction to the UC, and the UC handed AH MING $2000 in exchange for 49.5 grams of methylone.

### February 20, 2014 Firearm Transaction

9.     On February 20, 2014, the UC purchased a firearm from JIANG, which was provided by SHU YONG.   During the transaction, the UC and SHU YONG spoke on the phone to discuss the price and related issues.

### February 27, 2014 Crystal Meth Transaction

10.     On February 27, 2014, the UC met separately with JIANG and NG.   The UC first met with JIANG, during which time he obtained a new sample of crystal meth from JIANG, which JIANG represented was provided by SHU YONG.   During that meeting, JIANG put the UC on the phone with SHU YONG so that the UC could discuss the transaction with SHU YONG.

11.     Later that day, the UC met with NG.   The UC asked NG whether NG could obtain crystal meth.   NG suggested that they meet again later that day, at about 7:00 or 8:00 p.m., and made several telephone calls in the UC's presence.   Included among these calls was a call to KEVIN.   The following is an excerpt of that call:

| | |
|---|---|
| KEVIN: | Hello? |
| NG: | Hey, that, that, that, that…will you be able to get it?   It's not, it's not, it's not the "Seafood."   The other "Pork". |
| KEVIN: | "Pork"… How much do you need?   The order that I asked yesterday is still not placed today. |
| NG: | I have not decided yet. |
| KEVIN: | It hasn't been deliver[ed] yet. |

| NG: | I know.   Will it be available tonight? |
| KEVIN: | I don't know.   How much stuff do you want to order? |
| NG: | Right now, one quarter. |
| KEVIN: | [UNINTELLIGIBLE] |
| NG: | A quarter or a half. |
| KEVIN: | It's better to take half.   It's more worth it. |
| NG: | I know that, but when will you have it?   Today I need to tell him.   I am with him right now at the shopping place. |
| KEVIN: | Uh…okay. I will ask.   I will call you when I am done with the phone call.[2] |

Based on my training and experience and the investigation so far, I believe NG called KEVIN to discuss the acquisition of narcotics for the UC, using the code words "pork" and "seafood" to indicate different kinds of narcotics.   NG also added that he wanted a "quarter" or a "half;" based on my training, experience and the investigation to date, I believe that the words "quarter" and "half" refer to a quarter ounce (7 grams) or a half ounce (14 grams), which are common weights in drug transactions.

12.     After an additional call to KEVIN, NG left the UC and agreed to meet with the UC later that afternoon/evening.   Over the next few hours, agents from the DEA

---

[2]     This transcript, along with the other transcripts presented in this Affidavit, is of a recording made from a Court-authorized Title III wire intercept.   Not all relevant intercepted calls are described herein.   Moreover, for those calls described, not all relevant portions of such conversations have been described.   To the extent that quotations are used in the descriptions below, the quoted segments are based on draft line sheets and reviews of recordings and not final transcripts.   Quoted passages include translations from Cantonese, Mandarin and Fujianese in draft form.   Also, dates and times are approximate and based on the monitoring equipment at the time the call was intercepted.

surveiled NG as he drove to several different locations in Queens, New York, including the residence of KEVIN.

13.     At approximately 7:30 p.m., NG and TSUI spoke on the telephone to discuss transportation to the meeting site.   The following is an excerpt of one of their conversations:

| | |
|---|---|
| TSUI: | What now? |
| NG: | No, it's better to wait for you, better to wait for you.   Better to wait for me. |
| TSUI: | Wait for me again? Where are you? |
| NG: | Deliver it there and I'll collect…collect the money. |
| TSUI: | Where are you? |
| NG: | Home. I'll wait for you at home. |
| TSUI: | Ok, ok. Mm. Bye. |

14.     Shortly before 8 p.m. that evening, TSUI drove to NG's residence, picked up NG, and then drove NG to the Sheraton Hotel in Flushing, Queens to meet with the UC. Agents from the DEA surveiled the hotel and saw NG enter and exit the hotel while TSUI stayed in the car.   Once he was inside the hotel, NG sold the UC approximately 8 grams of crystal meth.

15.     The next day, February 28, 2014, KEVIN called NG.   During this conversation, KEVIN asked NG, "So what did he say about the seafood that you brought over?" Based on my training and experience and the investigation so far, I believe that KEVIN called NG because he was curious to learn what the UC thought of the quantity of narcotics that KEVIN had provided NG for the UC.

## March 27, 2014 Crystal Meth Transaction

16.     On March 27, 2014, the UC met with SHU YONG, JIANG and RONG WEI at the Lake Pavilion Restaurant in Queens, New York.   During this meeting, the UC told SHU YONG that he had $3700 in cash and that he wanted to purchase an ounce of crystal meth. SHU YONG then told the UC, in sum and substance and in part, that he would need to leave the restaurant to obtain the ounce of crystal meth and that he would return shortly to complete the sale.

17.     Agents observed SHU YONG and RONG WEI get into RONG WEI's car and drive away from the restaurant parking lot.   Over the next several hours, agents observed SHU YONG and RONG WEI drive their vehicle to different locations and then return to the Lake Pavilion Restaurant.   Once there, SHU YONG identified the UC and entered the UC's car.   Once inside the car, the UC gave SHU YONG $3700 as payment for the previous sample of crystal meth and for a bag containing approximately 17 grams of crystal meth.

## April 17, 2014 Crystal Meth Transaction

18.     On April 17, 2014, at approximately 4:40 p.m., the UC, the CW and NG met at the Sheraton Hotel in Flushing, Queens to negotiate an additional narcotics transaction. Prior to the meeting, at approximately 3:30 p.m., TSUI called NG and stated "aren't you meeting someone at 4 o'clock?"

19.     During the meeting, the UC requested two ounces of crystal meth.   At approximately 6:05 p.m., NG left the hotel.   A few minutes later, at approximately 6:13 p.m., NG called TSUI.   The following is an excerpt of that conversation:

NG:                    What's going on big brother Jimmy?

| TSUI: | What? |
| NG: | Where are you? |
| TSUI: | I'm home, what now? |
| NG: | Nothing, I'm coming back home. |
| TSUI: | Fine, just come back. |
| NG: | I have something to be work on.   I'm working on something. Motherfucker, If I should call "K". |
| TSUI: | What does it have to do with K? |
| NG: | Ah... Uncle Guai doesn't have that much.   He doesn't have that much. |
| TSUI: | K doesn't have it. |
| NG: | He can't get it? |
| TSUI: | You can ask him, but I can tell you for sure that he doesn't have it. |
| NG: | Oh... |
| TSUI: | If he tells you that he does have some, then he's slapping himself across the face because he was telling me he doesn't have any this whole time.   Is he really that stupid? |
| NG: | Then how come last time he said he has some? [LAUGHS] |
| TSUI: | He told me he has none. |
| NG: | Remember last time when I borrow three hundred dollars from you? |
| TSUI: | Yeah. |
| NG: | That's when I asked him to help me. |
| TSUI: | Well, he told me he doesn't have any every time. |

Based on my training, experience and the investigation to date, NG and TSUI are discussing

whether KEVIN ("K") has narcotics to satisfy NG's order.

20.     Once NG and TSUI finished their telephone call, NG immediately called

KEVIN.   The following is an excerpt of that conversation:

| | |
|---|---|
| KEVIN: | You can speak. |
| NG: | Can you go out and do something? |
| KEVIN: | What kind of thing do you want me to do?   Is it "Pork"? |
| NG: | I'm asking you to help me to do something.   Actually it's better if I can come over in person and talk to you it's better. |
| KEVIN: | I'm home. |
| NG: | Okay, I can be there in two minute[s] at your home. |
| KEVIN: | Yeah, okay. |

Based on my training, experience and the investigation to date, NG and KEVIN are again using

the word "pork" as code for narcotics.   A few minutes after NG and KEVIN completed their

telephone call, agents surveilled NG as he arrived at KEVIN's residence and entered KEVIN's

building.

21.     Similar to prior transactions, NG and TSUI spoke on the phone to discuss

transportation to the meeting site.   Agents then observed TSUI and NG drive to the Sheraton

Hotel.   As they drove to the hotel, NG called KEVIN; the following is an excerpt of that

telephone call:

| | |
|---|---|
| NG: | Uh, I'm on Parson and Roosevelt, on my way going down, (I'm) about to arrive. |
| KEVIN: | Uh, you come to… You will be coming to 3370, right? |
| NG: | 3370?   I have to drive back again and turn around.   That, that, those newspapers, newspapers are still over there. |
| KEVIN: | Can't you just come over here? |

| | |
|---|---|
| NG: | Me?   He is there eating dinner. He… |
| KEVIN: | Where? |
| NG: | He's having dinner underneath the hotel. |
| KEVIN: | Which hotel? |
| NG: | That one, Sheraton, Sheraton. |
| KEVIN: | How far is it from Sheraton to over here? |
| NG: | I, I asked Brother Jimmy to drive. |
| KEVIN: | Okay. |
| NG: | Would it be a bit better if I waited for you at the parking lot? |
| KEVIN: | I'm afraid. |
| NG: | No, you go down only when you see me. |
| KEVIN: | Okay, fine. |
| NG: | No, you, you are not going to see him, only me. |
| | [VOICES OVERLAP] |
| KEVIN: | I, I won't see any one, all right? |
| NG: | Won't see anyone, of course, you certainly won't see anyone, okay?   (You) will only see me.   I'll go down to take care of it and will get back to give, give you the newspapers. |
| KEVIN: | Uh, fine, bye. |

Based on my training, experience and the investigation to date, I believe that NG encouraged

KEVIN to come to the hotel so that NG could give Kevin "newspapers," which appears to be

code word for money.   During this conversation, KEVIN expressed fear at the prospect of

coming to the hotel but NG assured KEVIN that KEVIN wouldn't see anyone other than himself (NG).

22.     Once NG, TSUI and KEVIN arrived at the Sheraton Hotel, agents surveiled NG as he walked over to KEVIN's vehicle and talked with KEVIN.   NG then went into the Sheraton Hotel alone.   Once he was inside the hotel, NG gave the UC 42 grams of crystal meth in exchange for $4600.

### April 29, 2014 Crystal Meth and Firearm Transaction

23.     On April 28, 2014, at approximately 8:23 p.m., SHU YONG and the UC talked over the telephone and agreed to meet to purchase additional narcotics and firearms. They discussed the prices of two firearms, using the pre-established code word "metal cabinet" to describe the weapons.   A few hours later, SHU YONG called JIANG and told JIANG that the meeting would be the following day at 3 p.m.   The next day, at approximately 3 p.m., the UC met with SHU YONG and JIANG at the Lake Pavilion Restaurant.   During the meeting, SHU YONG sold the UC approximately an ounce of crystal meth for $4,000, as well as two handguns for $3,300.

14

WHEREFORE, your deponent respectfully requests that the defendants SHU

YONG YANG, RONG WEI YANG, JIA BIN JIANG, HAN WOON NG, AH MING, SZE

WONG TSUI, and FNU LNU, alias "KEVIN," be dealt with according to law.

S/ Justin Jacobs

_____

JUSTIN JACOBS
Special Agent, Drug Enforcement Administration

Sworn to before me this
 6  day of June, 2014

S/ Marilyn D. Go

_____
THE HONORABLE MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK